```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
                        WESTERN DIVISION
```

---

```
                              Ⅹ
SZUMANSKI STROUD,             Ⅹ
                              Ⅹ
      Petitioner,             Ⅹ
                              Ⅹ
vs.                           Ⅹ      No. 10-2624-STA-cgc
                              Ⅹ
JERRY LESTER,                 Ⅹ
                              Ⅹ
      Respondent.             Ⅹ
                              Ⅹ
```

---

```
       ORDER DENYING PETITION PURSUANT TO 28 U.S.C. § 2254
            ORDER DENYING CERTIFICATE OF APPEALABILITY
           ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
                                AND
        ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL
```

---

Before the Court are the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition") filed by Petitioner Szumanski Stroud, Tennessee Department of Correction prisoner number 250345, an inmate at the West Tennessee State Penitentiary ("WTSP") in Henning, Tennessee (ECF No. 1), Petitioner's Motion for Appointment of Counsel (ECF No. 16), Respondent's Motion for Waiver of W.D. Tenn. Local Rule 56.1(a) (ECF No. 20), and Respondent's Motion for Summary Judgment (ECF No. 21). For the reasons stated herein, the Court DENIES the pending motions and DENIES the Petition.

I.        **BACKGROUND**

    **A.    State Court Procedural History**

On September 1, 2005, a grand jury in Shelby County, Tennessee, returned an indictment charging Stroud with two counts of aggravated assault.[1] The indictment alleged that, on May 26, 2005, Stroud assaulted Randy Smothers (Count 1) and Denita Harvey (Count 2) with a deadly weapon, causing them to reasonably fear imminent bodily injury.[2]

A jury trial in the Shelby County Criminal Court commenced on June 5, 2006, and, on June 6, 2006, the jury returned a guilty verdict on both counts of the Indictment.[3] At a sentencing hearing on August 15, 2006, Stroud was sentenced as a Range II multiple offender to consecutive terms of seven years, six months for each aggravated assault, for a total sentence of fifteen (15) years.[4] The Tennessee Court of Criminal Appeals affirmed. State v. Stroud, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158 (Tenn. Crim. App. Oct. 29, 2007), *appeal denied* (Tenn. May 5, 2008).

---

[1]    Indictment, State v. Stroud, No. 05-06225 (Shelby Cnty. Crim. Ct.), ECF No. 13-1 at PageID 85-87.

[2]    In addition to the aggravated assaults charged in Case Number 05-06225, Stroud was also indicted for attempted murder and aggravated assault in Case Number 05-06224. That case was resolved by *nolle prosequi* on June 5, 2006. *See* http://jssi.shelbycountytn.gov/.

[3]    Trial Tr. 91-92, State v. Stroud, No. 05-06225 (Shelby Cnty. Crim. Ct.), ECF No. 13-4 at PageID 244-45.

[4]    Sentencing Hr'g Tr. 12, id., ECF No. 13-6 at PageID 269; J.'s, id., ECF No. 13-1 at PageID 92-93.

On June 15, 2008, Stroud filed a *pro se* petition pursuant to
the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-
30-101 through -122, in the Shelby County Criminal Court.[5] The
State answered the Petition on September 11, 2008.[6] Counsel was
appointed to represent Stroud and, on February 5, 2009, an amended
and supplemental petition was filed.[7] An evidentiary hearing was
held on March 12, 2009.[8] The post-conviction court denied the
petition on April 6, 2009,[9] and the Tennessee Court of Criminal
Appeals affirmed, Stroud v. State, No. W2009-01641-CCA-R3-PC, 2010
WL 376611 (Tenn. Crim. App. Feb. 3, 2010), *appeal denied* (Tenn. May
10, 2010).

The Tennessee Court of Criminal Appeals summarized the
evidence introduced at trial:

> Randy Smothers testified for the state that his
> fiancee, Denita Harvey, was the defendant's sister and
> that he had known the defendant for about three or four
> years. He said that on May 26, 2005, at about 3:00 or
> 4:00 p.m., he was driving Ms. Harvey's car, with her as
> a passenger. He said that as he approached a four-way
> stop, he saw a "newer type" white truck occupied by two
> men, one of whom had a white towel or cloth tied around
> his mouth and nose. He said the truck was on the opposite

[5]     Pet. for Relief from Sentence or Conviction, Stroud v. State, Case
No. 05-06225 (Shelby Cnty. Crim. Ct.), ECF No. 13-11 at PageID 343-48.

[6]     Resp. of the State of Tenn. to Pet. for Post-Conviction Relief, id.,
ECF No. 13-11 at PageID 349.

[7]     Am. & Suppl. Pet. for Post Conviction Relief, id., ECF No. 13-11 at
PageID 350-58.

[8]     Pet. for Post-Conviction Relief Hr'g Tr., id., ECF No. 13-12.

[9]     Order Denying Pet. for Post-Conviction Relief, id., ECF No. 13-11 at
PageID 359-64.

side of the road coming toward him. He said he could see the masked person's eyes and recognized him as the defendant. He said he told the defendant's sister to recline in her seat because he thought he saw her brother and "ain't no telling what he might do." He said that no words were exchanged between him and the defendant, that "[t]hey proceeded to pull off," and that he made a U-turn and sped away. He said he was afraid the defendant was coming to retaliate against him because of an altercation that had taken place two days earlier. He said that after he sped off, the truck caught up to him. He said that the defendant was in the passenger seat and hung out the window with a gun pointed at the witness. He said that at least four or five shots were fired and that none of them hit the car he was driving. He said he swerved in the street to avoid being shot and sped around the neighborhood in order to get away. He said that he did not recognize the driver and that he did not see the driver with a gun. Smothers said he reported the incident to the police and that he identified the defendant from a photograph lineup on June 8.

Mr. Smothers testified that he and the defendant had an altercation on May 24 because the defendant was upset that Smothers had not given the defendant bail money to get the defendant's younger brother out of jail. He said he had received a series of irate voice mail messages at about 4:00 a.m. from the defendant and that he had returned the call and attempted to discuss the situation with the defendant. After the calls, the defendant came to the home Smothers shared with Ms. Harvey. He said the defendant banged on the door and was admitted by Ms. Harvey. He said the defendant ran inside and hit him in the mouth. He said they "tussled around for a minute" until Smothers stabbed the defendant "about two times." He said the defendant ran outside, took a wooden log from a flower bed, charged into the house, and threw it into the path of Smothers' daughter. He said that he stabbed the defendant another time and that the defendant ran away. He said that during the incident, the defendant said little other than cursing him, although as he left, the defendant said that he would be back. Smothers said he reported the incident to the police. He said he did not have any contact with the defendant between the incident at his house on May 24 and the time he saw the defendant on the road on May 26.

4

Mr. Smothers testified that he had saved the voice mail messages from the defendant and had let the police listen to them but that they had automatically deleted from his cellular telephone after a few days. He said that he received additional threats by voice mail and had taken his family to stay in a hotel after the May 24 altercation.

Mr. Smothers acknowledged that he had been convicted of burglary of a motor vehicle and theft of property valued at more than $500. He said, however, that he was telling the truth about the defendant's actions.

Denita Harvey testified that Randy Smothers was the father of her two children and that the defendant was her oldest brother. She said she had been asked to give money for her youngest brother's bail but that she refused because she did not have the money. She said that the defendant wanted Mr. Smothers to contribute money but that Smothers refused and the defendant became angry. She said the defendant expressed his anger with Mr. Smothers in a telephone call to her.

She said that Smothers and the defendant got into an altercation on May 24, 2005, at the house in which she and Smothers lived. She said her children were present in the home at the time. She said that she heard banging on the door and that she opened the door for the defendant. She said that the defendant and Smothers began fighting and that she could not recall what was said. She said that after Smothers stabbed the defendant, the defendant left the house. She said that the defendant was not armed when he arrived but that he had thrown a stick before Smothers stabbed him. She said that she called the defendant immediately afterward to check on his condition, that he was not okay, and that she had heard he required treatment at the hospital. She said the police were called about an hour after the altercation.

Ms. Harvey testified that on May 26, 2005, at about 2:00 or 3:00 p.m., she was a passenger in her 2000 Pontiac Grand Prix, which Smothers was driving. She said she saw a person whom she could not positively identify as the defendant in a white truck. She said that the person had something over the lower part of his face and that she did not recognize the driver. She said Smothers told her to get down and that she got on the floorboard. She said that while she was on the floorboard, shots were

fired and the car was twisting around. She said that she did not see someone with a weapon but that she heard gunshots. She said she and Smothers talked to the police that day. Ms. Harvey acknowledged she had told the police on May 26 that the defendant was the person who was responsible. She said, however, that she could not positively identify him and that she had assumed he was responsible because of the altercation.

Officer Daniel Miller of the Memphis Police Department testified that he was working the Bravo shift, which is from 7:00 a.m. until 3:30 p.m, on May 24, 2005. He said he responded to a "fight call" and spoke with Randy Smothers. He said Smothers told him he had gotten into an altercation with the defendant. He said Smothers reported that the altercation was over money that the defendant believed was owed him. He said that Denita Harvey was on the scene, as well and that he spoke with her briefly. He said he was not told that someone had been stabbed.

Officer Tristan Brown of the Memphis Police Department testified that he was working the Delta shift, which is from 5:00 p.m. until 1:00 a.m., on May 26, 2005. He said he responded to an aggravated assault call at 6:35 p.m. that day. He said that Smothers was upset and reported that he had been in an altercation with his "brother" in which his brother came by in a car and shot at him because of an earlier incident. He said Smothers reported that he had stabbed his brother in an earlier incident. He said he also spoke with Denita Harvey, who advised him that the shooter had been the "victim's brother." He said that Smothers and Harvey identified the shooter by name as the defendant. Officer Brown said that he was advised of telephone calls that the defendant had placed and that he listened to some telephone messages but that he could not remember exactly what was said.

The defendant did not offer any proof. The jury found him guilty of two counts of aggravated assault.

State v. Stroud, 2007 WL 3171158, at *1-3.

**B.   Procedural History of Stroud's § 2254 Petition**

On August 26, 2010, Stroud filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, accompanied by a

legal memorandum and a motion seeking leave to proceed *in forma pauperis*. (ECF Nos. 1 & 2.) The Court granted leave to proceed *in forma pauperis* on September 8, 2010. (ECF No. 3.) In an order issued on October 5, 2010, the Court directed Respondent to file the state-court record and a response to the Petition. (ECF No. 4.) On January 14, 2011, Respondent filed his Answer [to] Petition for Writ of Habeas Corpus (ECF No. 12) and, on January 18, 2011, Respondent filed most of the state-court record (ECF No. 13).[10] Petitioner did not file a Reply.

On January 18, 2013, Petitioner filed a Motion for Appointment of Counsel. (ECF No. 16.) "The constitutional right to counsel in criminal proceedings provided by the Sixth Amendment does not apply to an application for writ of habeas corpus, which is a civil proceeding." Staple v. Lafler, No. 07-cv-12452, 2010 WL 3341530, at *2 (E.D. Mich. Aug. 24, 2010) (citing Cobas v. Burgess, 306 F.3d 441, 444 (6th Cir. 2002)); *see also* Hoggard v. Purkett, 29 F.3d 469, 471 (8th Cir. 1994) (same, collecting cases). There is no constitutional right to the appointment of counsel in civil cases, and the Court has broad discretion in determining whether counsel should be appointed. Childs v. Pellegrin, 822 F.2d 1382, 1384 (6th Cir. 1987). "The decision to appoint counsel for a federal habeas

---

[10]     On December 28, 2011, the Court granted Respondent's third motion for an extension of time to answer or otherwise respond to the Petition and extended the due date to January 14, 2011. (ECF No. 11.) The state-court record was also due on January 14, 2011. Respondent has offered no explanation for his failure to file the state-court record in a timely manner. The Court will exercise its discretion to accept these late filings *in this instance only*.

petitioner is within the discretion of the court and is required only where the interests of justice or due process so require." Mira v. Marshall, 806 F.2d 636, 638 (6th Cir. 1986); *see also* 18 U.S.C. § 3006A(a)(2)(B) (counsel may be appointed for persons seeking relief under 28 U.S.C. § 2254 who are financially eligible whenever the court determines "that the interests of justice so require"). The appointment of counsel is mandatory only when an evidentiary hearing is required. Rule 8(c), Rules Governing Section 2254 Cases in the United States District Courts ("§ 2254 Rules") ("If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A.").

> In exercising its discretion, the district court should consider the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other relevant factors. Where the issues involved can be properly resolved on the basis of the state court record, a district court does not abuse its discretion in denying a request for court-appointed counsel.

Hoggard, 29 F.3d at 471 (citations omitted).

Because the instant case can be resolved on the state-court record without an evidentiary hearing, the motion for appointment of counsel is DENIED as moot.

On April 19, 2013, Respondent filed a Motion for Waiver of W.D. Tenn. Local Rule 56.1(a) and a Motion for Summary Judgment. (ECF Nos. 20 & 21.) On May 7, 2013, Petitioner filed his Response to Repondent's [sic] Motion for Summary Judgment. (ECF No. 22.) The

argument presented in the summary judgment motion is substantially similar to that in the Answer. Respondent's motion does not adequately state why a summary judgment motion is appropriate in this case, how the Court is to apply the summary judgment standard if Respondent is excused from submitting a statement of undisputed facts, and how the summary judgment standard differs from the review conducted by the Court under Rule 8(a) of the § 2254 Rules upon receipt of the answer, reply, and state-court record. Because these procedural issues can be avoided by assessing Petitioner's claims under Rule 8(a), Respondent's motions are DENIED as unnecessary. Petitioner's response will be treated as a Reply to the Answer.

In an order issued on May 31, 2013, the Court directed Respondent to supplement the state-court record by filing the briefs on the post-conviction appeal. (ECF No. 23.) Respondent complied with that order on June 6, 2013. (ECF No. 24.)

**II.       PETITIONER'S FEDERAL HABEAS CLAIMS**

In his federal habeas petition, Stroud raises the following issues:

1.   Whether the post-conviction court erred by finding the Petitioner failed to prove ineffective assistance of counsel;

2.   Whether there was sufficient evidence to support the verdicts beyond a reasonable doubt;

3.   Whether the trial court abused its discretion and committed plain error by allowing one half of a consolidated indictment to stand trial and

                improperly severing the other half of the indictment; and

4.    Whether the trial judge imposed an excessive sentence.

(ECF No. 1 at 5-7; ECF No. 1-1 at 7.)

## III.      THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.    Waiver and Procedural Default

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. Cullen v. Pinholster, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011). The petitioner must "fairly present"[11] each claim to all levels of state court review, up to and

---

[11]    For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. Gray v. Netherland, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996).

including the state's highest court on discretionary review, Baldwin v. Reese, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, O'Sullivan v. Boerckel, 526 U.S. 837, 847-48, 119 S. Ct. 1728, 1733-34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003); see Smith v. Morgan, 371 F. App'x 575, 579 (6th Cir. 2010) (the Adams holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. See Edwards v. Carpenter, 529 U.S. 446, 452-53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. Wainwright

11

v. Sykes, 433 U.S. 72, 87-88, 97 S. Ct. 2497, 2506-07, 52 L. Ed. 2d 594 (1977); see Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 732, 111 S. Ct. at 2555; see Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 322, 115 S. Ct. 851, 864, 130 L. Ed. 2d 808 (1995); Coleman, 501 U.S. at 750, 111 S. Ct. at 2565. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. Schlup, 513 U.S. at 321, 115 S. Ct. at 864; see House v. Bell, 547 U.S. 518, 536-39, 126 S. Ct. 2064, 2076-78, 165 L. Ed. 2d

1 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

**B.   Merits Review**

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (internal quotation marks and citations omitted).[12]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen, ___ U.S. at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a

---

[12]   The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007).

conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).[13] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412-13, 120 S. Ct. at 1523. The state court's application of clearly established federal law must be "objectively unreasonable." Id. at 409, 120 S. Ct. at 1521. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. Renico v. Lett, 559 U.S. 766, ___, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010); Williams, 529 U.S. at 411, 129 S. Ct. at 1522.

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in Wood v. Allen, 558 U.S. 290, ___, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010), the Supreme Court stated that a state-court factual determination is not

---

[13]    The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam); see Mitchell v. Esparza, 540 U.S. 12, 16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (same); Treesh v. Bagley, 612 F.3d 424, 429 (6th Cir. 2010) (same), cert. denied, ___ U.S. ___, 131 S. Ct. 1678, 179 L. Ed. 2d 622 (2011).

"unreasonable" merely because the federal habeas court would have reached a different conclusion. In Rice v. Collins, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[14]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" Harris v. Haeberlin, 526 F.3d 903, 910 (6th Cir. 2008) (quoting Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. Ayers v. Hudson, 623 F.3d 301, 308 (6th Cir. 2010); see Hudson v. Lafler, 421 F. App'x 619, 624 (6th Cir.

---

[14]     In Wood, 120 S. Ct. at 845, 848, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. Id. at 849, 851. In Rice, 546 U.S. at 339, 126 S. Ct. at 974, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

2011) (same), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1085, 181 L. Ed. 2d 803 (2012).

**IV.      ANALYSIS OF PETITIONER'S CLAIMS**

**A.   Sufficiency of the Evidence (Claim 2)**[15]

In his second claim for relief, Stroud argues that the evidence is insufficient to sustain his convictions. (ECF No. 1 at 6; ECF No. 1-1 at 13-17.) Stroud challenged the sufficiency of the evidence on direct appeal,[16] and the Tennessee Court of Criminal Appeals rejected that claim on the merits, stating as follows:

> The defendant challenges the sufficiency of the convicting evidence. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See* State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. *See* State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

> The defendant was convicted of aggravated assault of Randy Smothers and Denita Harvey. As relevant to this appeal, that offense is defined as follows:

> (a) A person commits aggravated assault who:

---

[15]      In the interest of clarity, the Court will address the sufficiency of the evidence before the remaining issues.

[16]      Br. of Appellant at 3, 8-12, State v. Stroud, No. W2006-001945-CCA-R3-CD (Tenn. Crim. App.), ECF No. 13-7 at PageID 279, 284-88.

> > (1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
>
> ...
>
> > (B) Uses or displays a deadly weapon[.]

T.C.A. § 39-13-102(a)(1)(B). Assault, as pertinent to this appeal, is committed by one who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(2).

The defendant argues that the state's proof was deficient because neither Randy Smothers nor Denita Harvey testified that they were in fear of imminent bodily injury. This court has held that proof of a victim's fear may be inferred from circumstantial evidence. *See, e.g.,* <u>State v. Larry Allen Whited and William Henry Rutherford</u>, No. M2005-00167-CCA-R3-CD, Sumner County (Tenn. Crim. App. Mar. 7, 2006), *app. denied* (Tenn. Aug. 28, 2006). In the present case, there was proof that Smothers had taken his family to a hotel after a violent altercation with the defendant in Smothers' and Harvey's home. There was evidence that when Smothers saw the defendant on May 26, he made a U-turn and sped away because he was "afraid that he was coming back for retaliation," that the defendant pointed a gun at Smothers, that the defendant fired four or five shots, and that Smothers "was swerving in the street trying to prevent from getting shot." There was proof that Harvey got on the floorboard of the car and remained there for several minutes during the attack and that she heard the shots and felt the car swerving. In the light most favorable to the state, this proof sufficiently establishes that the victims were in reasonable fear of imminent bodily injury from the defendant's attack.

The defendant also argues that the proof of his identity was insufficient. He claims that both victims were predisposed to believe he was the shooter because of the prior altercation, that the shooter's face was partially concealed, and that the victims' opportunity to observe the shooter was minimal. He also argues that Harvey was unable to identify him with certainty at trial and that Smothers' testimony was that he told Harvey he "thought" he saw her brother, thereby qualifying his earlier positive identification of the defendant as the shooter. The jury had before it evidence that both

17

Smothers and Harvey identified the defendant to the police at the scene as their attacker, that Smothers identified the defendant as the attacker from a photograph lineup he viewed several days after the crimes, and that Smothers identified the defendant as his attacker at trial. The jury's verdict reflects that it accredited this evidence, as was its province as the trier of fact. This evidence is sufficient to support the defendant's convictions.

State v. Stroud, 2007 WL 3171158, at *3-4.

In Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92, 61 L. Ed. 2d 560 (1979), the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 — if the settled procedural prerequisites for such a claim have otherwise been satisfied — the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." This standard requires a federal district court to examine the evidence in the light most favorable to the State. Id. at 326, 99 S. Ct. at 2793 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

Because the Petition does not address the standards for evaluating habeas claims on the merits, it is unclear whether Stroud contends that the decision of the Tennessee Court of

Criminal Appeals on this issue was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding," id. § 2254(d)(2).

Stroud has not argued that the decision of the Tennessee Court of Criminal Appeals was contrary to Jackson v. Virginia. This is "a run-of-the-mill state-court decision applying the correct legal rule from [Jackson] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406, 120 S. Ct. at 1520.[17]

Stroud also has failed to satisfy his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Jackson v. Virginia or that it was based on an unreasonable determination of the facts. Stroud's presentation of this issue in his legal memorandum is substantially similar to his brief to the Tennessee Court of Criminal Appeals on

---

[17]   The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Id. at 406, 120 S. Ct. at 1520; see also id. at 407, 120 S. Ct. at 1520 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

direct appeal.[18] Stroud reiterates the arguments he presented to the Court of Criminal Appeals about insufficient proof of identity and the lack of direct testimony from the victims that they feared imminent bodily injury. (*See* ECF No. 1-1 at 13-17.) He fails to address the decision of the Tennessee Court of Appeals and, consequently, fails to identify any defect in the state court's reasoning.

Smothers testified that he knew Stroud as "my fiance's brother."[19] At the time of trial, he had known Stroud for "[p]robably about three years. Three or four years."[20] Smothers' fiancé was Denita Harvey, which whom he had two children.[21]

On May 26, 2005, Smothers was driving Harvey's vehicle.[22] Harvey was a passenger.[23] About "three or four in the evening time," Smothers "seen a truck with two guys sitting in it and one of them had a mask on as [he] approached the stop sign."[24] Smothers had no

---

[18]    *See* Br. of Appellant at 3, 8-12, State v. Stroud, No. W2006-001945-CCA-R3-CD (Tenn. Crim. App.), ECF No. 13-7 at PageID 279, 284-88. Stroud's discussion of the sufficiency of the evidence in his Reply does not address the standards under 28 U.S.C. § 2254(d). *See* ECF No. 22 at 5-8.

[19]    Trial Tr. 9, State v. Stroud, No. 05-06225 (Shelby Cnty. Crim. Ct.), ECF No. 13-4 at PageID 162.

[20]    Id. at 10.

[21]    Id. at 10-11.

[22]    Id. at 11.

[23]    Id.

[24]    Id. at 12.

difficulty seeing the individuals.[25] The mask "was a white mask tied around the mouth and nose part of his face," so he could see the individual from the eyes up.[26] Smothers recognized Stroud as the man wearing a mask.[27] Stroud's vehicle was "[o]n the left side of the road on the other side of the street, straight across."[28] Smothers' vehicle was moving at the time.[29]

Stroud did not say anything to Smothers.[30] Instead, Stroud's vehicle "proceeded to pull off and I turned around in my car and sped off."[31] Smothers explained that "I was afraid that [Stroud] was coming back for retaliation . . . [b]ecause we had a incident just a few days before that at my house."[32]

After Smothers sped off, Stroud's vehicle must have followed him. "Once they got close, I seen him hang out the window with a gun aiming at me, and I was swerving in the street trying to prevent from getting shot and sped around the neighborhood and lost them. They couldn't catch up with me."[33] Stroud was the only person

---

[25]    Id.

[26]    Id.

[27]    Id.

[28]    Id. at 13.

[29]    Id.

[30]    Id.

[31]    Id. at 14.

[32]    Id.

[33]    Id. at 20.

in the pursuing vehicle who displayed a firearm.[34] Stroud did not strike Smothers' vehicle.[35]

Smothers called the police after the incident.[36] Smothers testified that he "went to the other side of the neighborhood almost to Bartlett and I parked in a apartment complex and called the police."[37] The call was made "[n]o more than 10 minutes or less" after the incident.[38] Smothers testified that the police "came right away, straight to me."[39] He identified Stroud from a lineup as the person he saw shooting at him.[40] Smothers acknowledged that he had known Stroud for three years due to his relationship with Stroud's sister.[41] Smothers testified that he understood the importance of telling the truth.[42] He acknowledged his prior conviction for burglary of a motor vehicle and theft of property over $500.[43] Smothers testified at the preliminary hearing in May 2005, at which time he identified Stroud as the person who had shot

---

[34]    Id.

[35]    Id.

[36]    Id. at 20-21.

[37]    Id. at 21.

[38]    Id.

[39]    Id.

[40]    Id. at 22-23.

[41]    Id. at 23.

[42]    Id.

[43]    Id. at 24.

at him.[44] Smothers stated unequivocally that Stroud was the person who shot at him and Harvey on May 26, 2005.[45]

On cross-examination, Smothers testified that the date of the photo lineup was June 8, 2005, two weeks after the incident.[46] Smothers acknowledged that he knew Stroud and did not need to look at a lineup to identify him.[47]

Smothers could not identify the intersection where he saw Stroud wearing a mask.[48] It was a four-way stop.[49] Smothers did not recognize the driver of the car, who was not wearing a mask.[50] Smothers testified that he "didn't quite make it all the way to the stop sign" before he saw Stroud.[51] The other vehicle was "[p]robably a block away. Half a block away."[52] There was not much traffic on the street.[53] The incident began in a residential area, and people were out in their yards.[54] Smothers did not know the names of any

---

[44]   Id. at 24-25.

[45]   Id. at 25.

[46]   Id. at 27-28.

[47]   Id. at 28.

[48]   Id.

[49]   Id. at 29.

[50]   Id.

[51]   Id. at 29-30.

[52]   Id. at 30.

[53]   Id.

[54]   Id. at 30-31.

of the people he saw.[55] When he saw Stroud, Smothers "busted a U-turn right there in the street."[56] Smothers explained that "I tried to — turned around and get a head start to get away from them."[57] Smothers never made it all the way to the stop sign.[58] According to Smothers, the other vehicle

> followed me all the way up the street, up another street.
> I turn out — he followed me all the way up the street. I
> turned out on Raleigh Millington and I busted a U-turn in
> the middle of the street. When I got to Raleigh
> Millington was a whole lot of cars coming. I bust a U-
> turn. I balled [sic] all the way back up and I went
> through some other part of — turned a whole lot of
> streets in the neighborhood and I got away from them.[59]

The shooting began "[a]s soon as I turned off Raleigh Millington."[60]

Smothers then clarified that, when he first saw Stroud, he made a U-turn and the other vehicle fell in behind him.[61] "I got about a mile up the street and it was Raleigh Millington."[62]

> I pulled out in front of — in Raleigh Millington and
> that's when one shot was fired. And the traffic cut me
> off. So I turned that way. And I got a good while down
> the street and they caught up with me. So I went through
> — I made another right turn something other, I don't know
> the name of the street. It's a residential neighborhood.

---

[55]    Id. at 31.

[56]    Id.

[57]    Id.

[58]    Id. at 31-32.

[59]    Id. at 32.

[60]    Id. at 33.

[61]    Id.

[62]    Id.

24

And I went through a couple of corners and shook them off and took off another way and got away.[63]

Smothers testified that "[i]t was at least four or five shots" that were fired.[64] None of the shots struck Smothers' vehicle.[65]

During these events, Harvey was "laying down in the passenger seat."[66] According to Smothers, "I told her to lay back in her seat. I think I see her brother and ain't no telling what he might do."[67]

Smothers testified that Stroud was not wearing a hat on the day in question.[68] His hair was styled in dreads.[69]

On redirect, Smothers was asked how close the other vehicle got to him.[70] He testified that "[b]efore I ran in traffic on Raleigh Millington, it was almost bumper-to-bumper ready to hit me. But I, instead of slowing down, I just jumped out in traffic if I could. I almost got hit by a car, too."[71]

On recross-examination, Smothers was asked how long the two vehicles were bumper-to-bumper. He stated that "it was only for a quick second when they caught up cause I was trying to slow down a

---

[63]     Id. at 33-34.

[64]     Id. at 34.

[65]     Id.

[66]     Id.

[67]     Id.

[68]     Id. at 36.

[69]     Id.

[70]     Id. at 38.

[71]     Id. at 39.

little bit so I could jump out in traffic. It was only for a second before I jumped out on Raleigh Millington."[72] One shot was fired when Smothers "was out in the road, turned the corner."[73]

Smothers was also questioned about why he had not preserved the voicemail threats he claimed he had received from Stroud two days previously. He stated, "I was too busy running. I was worried about keeping my family safe and keeping them out the harms of him."[74] Smothers elaborated:

> After [Stroud] left the house [on May 24, 2005], I still got phone calls. And two days after that, he was following me, looking. Every time I look — turn around, I see him somewhere watching me, fixing to approach me and threatening me. So I took the proper precautions by keeping them safe. We got a hotel room. We got away for a while. And as we tried to come back home again, here we go again, popping up again.[75]

Denita Harvey testified that Smothers was the father of her two children and that she had known him for eleven years.[76] Stroud was her oldest brother.[77] Harvey acknowledged that Smothers and

---

[72]   Id. at 40.

[73]   Id.

[74]   Id. at 43.

[75]   Id. at 44.

[76]   Id. at 47-48.

[77]   Id. at 48.

26

Stroud got into an altercation at her house on May 24, 2005.[78] The police were called maybe an hour afterwards.[79]

On May 26, 2005, Smothers was driving Harvey's vehicle, and Harvey was in the passenger seat.[80] Harvey was asked whether they came into contact with Stroud, and she responded, "I guess, yes."[81] She also stated that "I couldn't positively identify him"[82] because there was something white on the lower portion of his face.[83] The individual in question was a passenger in a truck, and Harvey did not recognize the driver.[84] Harvey testified that "Randy told me to get down" and that "[a]t first I turned around to see what was going on, and then I got down in the floorboard of the car."[85] Harvey got up "[m]aybe three or four minutes later."[86] While Harvey was on the floorboards, "[s]hots were fired and the car was

---

[78]    Id. at 48-52.

[79]    Id. at 52.

[80]    Id. at 53.

[81]    Id.

[82]    Id.

[83]    Id. at 54.

[84]    Id.

[85]    Id.

[86]    Id. at 54-55.

twisting around[.]"[87] Harvey did not see a weapon, but she heard gunshots.[88]

Harvey testified that the police were called and she spoke with them that day.[89] She also testified as follows:

> Q.   Did you advise the police as to who was responsible?
>
> A.   Yes.
>
> Q.   And did you tell the police that it was Szumanski Stroud?
>
> A.   Yes.
>
> Q.   But today you're saying that you couldn't identify him?
>
> A.   No.
>
> Q.   Why then did you say it was Szumanski Stroud and today you won't say who?
>
> A.   Because of the altercation. I assumed automatically that it was him.
>
> Q.   Okay. But you told the police at that time that it was Szumanski Stroud?
>
> A.   Right.[90]

On cross-examination, Harvey testified that Smothers was driving her car on May 26, 2005.[91] She stayed on the floor for

---

[87]   Id. at 55.

[88]   Id.

[89]   Id.

[90]   Id. at 55-56.

[91]   Id. at 57.

"[m]aybe three or four minutes."[92] Harvey did not recall how many shots she heard.[93] She did not hear any bullets strike her car.[94] Harvey could not hear the vehicle that was following them.[95] Harvey recalled that the incident occurred "[a]pproximately two, three in the afternoon" in a residential area.[96] Because she was on the floor, she did not know if anyone else saw the incident.[97] Harvey's car was not struck.[98] Harvey did not recall whether she gave a statement to the police.[99]

On redirect, Harvey testified that the police were called "probably 15, 20 minutes" after the shooting.[100]

Memphis Police Officer Tristan Brown testified that he responded to a call about the incident.[101] Brown testified that Harvey told him that Stroud was the person who had shot at them.[102]

---

[92]   Id.

[93]   Id.

[94]   Id.

[95]   Id. at 57-58.

[96]   Id. at 58.

[97]   Id.

[98]   Id. at 59.

[99]   Id.

[100]   Id.

[101]   Id. at 65-67.

[102]   Id. at 68-69.

The evidence introduced at trial is more than sufficient to sustain Petitioner's convictions for aggravated assault. Smothers testified unequivocally at trial that Stroud was the person who had shot at him.[103] Smothers also identified Stroud as the shooter when he spoke to police immediately after the incident and at the preliminary hearing. Harvey did not identify Stroud as the shooter at trial, but she acknowledged that the incident described by Smothers occurred and that she told the police at the time that Stroud was responsible. That a portion of the shooter's face was obscured by a towel or mask and that the victims had only a brief opportunity to view the shooter from a distance are matters for the jury to consider. The jury obviously found that the victims had sufficient opportunity to observe Stroud and to identify him. Stroud has not satisfied his burden of establishing that this aspect of the decision of the Tennessee Court of Criminal Appeals was an objectively unreasonable application of <u>Jackson v. Virginia</u> or that it was based on an unreasonable factual determination.

Stroud also emphasizes that the victims did not explicitly state that they reasonably feared imminent bodily injury. (ECF No. 1-1 at 15-16.) Stroud does not address the statement of the Court of Criminal Appeals that "proof of a victim's fear may be inferred

---

[103]     Stroud argues that "Mr. Smothers qualified his earlier positive identification of the defendant as the culprit by testifying that he advised Ms. Harvey that he *thought* that he saw her brother." (ECF No. 1-1 at 17.) Regardless of how Smothers might have phrased his warning to Harvey, his testimony at trial did not exhibit any certainty about the identity of the shooter.

from circumstantial evidence." <u>State v. Stroud</u>, 2007 WL 3171158, at *3. As the Court of Criminal Appeals noted, the proof at trial was that Smothers feared that Stroud wanted to retaliate against him because of their altercation two days previously; that Smothers had taken his family to a hotel to hide from Stroud; that Stroud brandished a firearm when he saw Smothers and Harvey; that Smothers made an immediate U-turn and took other evasive action, including pulling quickly out onto a busy highway, to avoid Stroud's vehicle; that Harvey hid down by the floorboards of the car; that Harvey felt the car swerving back and forth; and that Stroud fired four or five shots at the car. The jury was entitled to infer from that evidence that both of the victims reasonably feared imminent bodily injury. Stroud has not satisfied his burden of establishing that that conclusion by the Tennessee Court of Criminal Appeals was objectively unreasonable.

The second issue is without merit and is DISMISSED.

**B.   Ineffective assistance of counsel (Claim 1)**

In his first claim for relief, Stroud asserts that his attorney rendered ineffective assistance, in violation of the Sixth Amendment. (ECF No. 1 at 5-6; ECF No. 1-1 at 8-13.) Specifically, Stroud claims that his attorney was ineffective in failing to question the victim about a falsified indictment and an earlier misidentification. (ECF No. 1 at 5; ECF No. 1-1 at 11.) The factual basis for this issue is as follows:

In addition to being charged in the Aggravated Assault for which he went to trial, the Appellant originally was charged in another case. This case was indictment number 05-06224, Criminal Attempt: First Degree Murder and Aggravated Assault. The victim was the same victim as in the case that went to trial and for which the Appellant was convicted. In February 2006, four months before trial, the State moved to consolidate these two indictments pursuant to Rules 8 and 13 of the Tennessee Rules of Criminal Procedure. However, on the day of trial the State *nolle prossed* indictment 05-06224 and proceeded to trial with indictment 05-06225.

The Appellant avers that the basis for the *nolle pros* of indictment 05-06224 was because the victim could not sufficiently identify him. However, Counsel for the Appellant did not inquire into this on cross-examination. Counsel should have asked the victim(s) if they had previously falsified the indictment and misidentified the Appellant in a similar case. The Appellant was entitled to have the jury hear that the credibility and memory of the victim was questionable. Such testimony was relevant because it bore on the credibility of the witnesses in the trial, and it involved the Appellant. Had the jury heard such testimony, there is a reasonable probability that a different outcome would have resulted. Counsel(s) failure to question the victim(s) on this issue prejudiced the Appellant and deprived him of a crucial defense.

(ECF No. 1-1 at 31-32.)

Stroud raised this issue during the post-conviction proceeding[104] and in the post-conviction appeal.[105] The Tennessee Court of Criminal Appeals rejected this claim on the merits, stating as follows:

At the evidentiary hearing, the petitioner testified that he was charged in one indictment with two counts of

---

[104]    *See* Am. & Suppl. Pet. for Post-Conviction Relief at 6-7, <u>Stroud v. State</u>, No. 05-06225 (Shelby Cnty. Crim. Ct.), ECF No. 13-11 at PageID 355-56.

[105]    *See* Br. of Appellant at 10-11, <u>Stroud v. State</u>, C.C.A. No. W2009-01641-CCA-R3-PC (Tenn. Crim. App.), ECF No. 24-1 at PageID 503-04.

aggravated assault, based on the May 26, 2005 incident, and in a second indictment with criminal attempt first degree murder and aggravated assault, based on allegations by Smothers and Harvey that someone had shot at them sometime between June 5 and June 7, 2005. He said that his May 24, 2005 fight with Smothers, in which Smothers stabbed him with a knife, did not result in any charges. The petitioner testified that the two indictments were consolidated for trial, but the State nolle prosequied the second indictment on the morning that the trial was scheduled to begin. He stated that he wanted evidence of both indictments introduced at trial and asked trial counsel to cross-examine the victim on the contradictory statements he had made in the indictments, but counsel failed to do so. The petitioner expressed his belief that counsel's failure to cross-examine the victim on the issue ruined his defense, which was based on proving that the victim was mistaken in his identifications.

Trial counsel testified that he had been licensed to practice law since 1982, had been with the public defender's office since 1989, and had handled thousands of cases, including an estimated 60 to 70 which had gone to trial, during his career. He said that he did not cross-examine Smothers about the dismissed indictment because he thought he had nothing to gain, and everything to lose, by bringing up an incident that would have revealed a pattern of violent behavior on the part of the petitioner. In his view, the decision not to cross-examine the victim on that issue was a sound one: "So it was a trial strategy and I think it was the proper trial strategy. I think if I brought that out, not only does it show a pattern, I'd have been bringing out an alleged prior bad act and the verdict would have been quicker than it was."

Trial counsel further testified that he told the petitioner it was within the prosecutor's discretion to dismiss one indictment and not the other and that the reason she dismissed the second indictment was not because she thought Smothers was fabricating his allegations, as the petitioner believed, but instead because the identification proof in the second case was not as strong. On cross-examination, he explained that the incident that formed the basis for the second indictment occurred at midnight on a residential street that was not very well lit. Trial counsel testified that

he explained to the petitioner why he chose not to cross-examine the victim on the dismissed indictment. As he recalled, the petitioner accepted his decision on the matter. Finally, trial counsel testified that Smothers was adamant in his identification of the petitioner as the perpetrator in both cases. He did not, therefore, think that there was anything in the proof of the dismissed case that would have helped the petitioner in his case at trial.

In response to questioning by the post-conviction court, trial counsel testified that he filed a motion in limine to exclude evidence of the May 24 fight between Smothers and the petitioner, but was overruled by the trial court.

On April 6, 2009, the post-conviction court entered an order denying the petition. Among other things, the court found that the petitioner failed to prove that it was not a sound strategic choice on the part of counsel not to cross-examine the victims with respect to the June 6 incident.

. . . .

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See* Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See* Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo,* with no presumption of correctness. *See* Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo,* with a presumption of correctness given only to the post-conviction court's findings of fact. *See* Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that

trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason,

35

courts need not approach the <u>Strickland</u> test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; *see also* <u>Goad</u>, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We conclude that the record fully supports the post-conviction court's finding that the petitioner failed to show he was denied the effective assistance of counsel. On appeal, the petitioner bases his ineffective assistance claim solely on counsel's failure to cross-examine Smothers about his identification in the nolle prosequied case, arguing that counsel was deficient for not doing so and that his deficiency in this respect prejudiced the outcome of the trial, which hinged on the credibility of the victim. Trial counsel, however, explained that his decision not to cross-examine the victims on the dismissed indictment was based on his belief that it would hurt the petitioner's case. He explained:

> As trial strategy and I did think about it a lot whether I should do it. I talked to several of my colleagues. Everybody's first reaction was why would you bring it up. Why would you bring up an alleged prior bad act of the [petitioner] showing what would then be a pattern of violence, three violent acts, the fist fight with a stick and a knife, the alleged shooting at the car and then bring up the third incident. I saw no way that it could help him.

There is nothing to show that trial counsel's decision was not part of a sound trial strategy or that his failure to cross-examine Smothers on the issue prejudiced the outcome of the case. The petitioner has not, therefore, met his burden of showing that he was denied the effective assistance of counsel.

<u>Stroud v. State</u>, 2010 WL 3776611, at *1-4.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in <u>Strickland v. Washington</u>, 466

36

U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [Strickland, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687, 104 S. Ct. 2052." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.[106] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Srickland, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of

---

[106] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." Id. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id. at 697, 104 S. Ct. at 2069.

a fair trial, a trial whose result is reliable.' <u>Id.</u>, at 687, 104 S. Ct. 2052." <u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 787-88; *see also* <u>id.</u> at ___, 131 S. Ct. at 791-72 ("In assessing prejudice under <u>Strickland</u>, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); <u>Wong v. Belmontes</u>, 558 U.S. at 15, 27, 130 S. Ct. 383, 391-92, 175 L. Ed. 2d 328 (2009) (per curiam) ("But <u>Strickland</u> does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, <u>Strickland</u> places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Ky.</u>, 559 U.S. 356, ___, 130 S. Ct. 1473, 1385 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. <u>Strickland</u>, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." <u>Id.</u>, at 689, 104 S. Ct. 2052; *see also* <u>Bell v. Cone</u>, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d

914 (2002); <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. <u>Strickland</u>, 466 U.S., at 690, 104 S. Ct. 2052.

<u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 788.

When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L. Ed. 2d 251 (2009).

> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," <u>id.</u>, at 689, 104 S. Ct. 2052; <u>Lindh v. Murphy</u>, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, <u>Knowles</u>, 556 U.S., at ----, 129 S. Ct. at 1420. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

<u>Richter</u>, ___ U.S. at ___, 131 S. Ct. at 788.

Stroud does not state whether he contends that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, or whether he believes the decision was based on an unreasonable determination of the facts in light of the evidence presented at the state-court proceeding. The decision of the Tennessee Court of Criminal Appeals was a run-of-the-mill decision applying the

holding of <u>Strickland v. Washington</u> to the facts of the case and, therefore, it was not contrary to <u>Strickland</u>.

Stroud also has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of <u>Strickland</u> or was based on an unreasonable factual determination. At the post-conviction hearing, trial counsel explained his decision not to cross-examine Smothers about the incident on May 26, 2005 that was reflected in Case Number 05-06224:

> Well, it appears from [sic] the gist of Mr. Stroud's testimony was that after the State nol-prossed the second case that I should have cross-examined the two victim witnesses about the third incident. As trial strategy and I did think about it a lot whether I should do it. I talked to several of my colleagues. Everybody's first reaction was why would you bring it up. Why would you bring up a prior bad act of the defendant showing what would then be a pattern of violence, three violent acts, the fist fight with a stick and a knife, the alleged shooting at the car and then bring up the third incident. I saw no way that it could help him.
>
> Mr. Smothers had assured me and Ms. Parks[, the prosecutor,] that Mr. Stroud was responsible for the third incident as well. Mr. Stroud seemed to think that Ms. Parks was convinced that Mr. Smothers was lying about his identification of the second event, when in fact that one happened at midnight. The lighting wasn't good. She didn't think his identification testimony was going to be quite as good.
>
> Absolutely positive about the first one so it was her decision, I told him, to nol-pros that second indictment. I told him just because she nol-prossed one doesn't mean that she has to nol-pros the other one. It's not because she thinks he's lying, she just doesn't think the proof is quite as strong and he had told me that he was positive that you, Mr. Stroud, had done it.

And I told him that if Ms. Parks thought that Mr. Stroud — I'm sorry, that Mr. Smothers was lying about the first incident, she would not have hesitated to nol-pros that one as well. She's nol-prossed several cases that we opposed each other on when she thought the proof wasn't there or that the witnesses were less than credible, let's say.

So I anticipated if I had asked Mr. Smothers about that other incident, he would say yeah, Mr. Stroud did that too. So we had nothing to be gained by that, and my trial strategy was and again, I talked to several people about it, and every person said I wouldn't bring that up. You have absolutely nothing to gain and so I chose not to cross-examine either of them about the second one.

And Ms. Harvey told my investigator that she thought well I don't really think Lopez [107] did the second one, but I'm convinced he had somebody else do it. So, I mean, it was just a lose, lose if I had gone into that. And again, I would have just shown a pattern. And I told him I had no control over what cases the State chose to nol-pros.

. . . .

So it was a trial strategy and I think it was the proper trial strategy. I think if I brought that out, not only does it show a pattern, I'd have been bringing out an alleged prior bad act and the verdict would have been quicker that it was.[108]

On cross-examination by post-conviction counsel, defense counsel testified that he spoke to Smothers briefly before trial to "introduce[] myself."[109] A defense investigator interviewed Smothers

---

[107]   At trial, Denita Harvey testified that Stroud sometimes went by the name "Lopez." Trial Tr. 51, State v. Stroud, No. 05-02665 (Shelby Cnty. Crim. Ct.), ECF No. 13-4 at PageID 204.

[108]   Post-Conviction Hr'g Tr. 40-42, 42-43, Stroud v. State, No. 05-02665 (Shelby Cnty. Crim. Ct.), ECF No. 13-12 at PageID 408-10, 410-11.

[109]   Id. at 44.

and drafted a report, which was shared with Stroud.[110] Defense counsel was also familiar with Smothers' statement to police and his testimony at the preliminary hearing.[111] Smothers' statements to the investigator were consistent with his previous statements.[112] Counsel testified that "[o]ne consistency I saw in all of them was that Mr. Stroud was responsible. [Smothers] was just as adamant in his statement to my investigator about the third incident or the second indictment that ended up being nol-prossed. And if there were any inconsistencies, they weren't glaring enough that I can recall them right now."[113] Counsel recalled that Smothers' trial testimony was consistent with his previous statements.[114] According to counsel, "I though Mr. Smothers was very credible, and the fact that Mr. Stroud's sister did testify that the event took place kind of negated any kind of argument that he fabricated it all, that Mr. Smothers fabricated it all. I mean, she confirmed that the shooting event happened."[115]

Counsel was asked his opinion about why the State chose not to try Case Number 05-06224, and he responded:

---

[110]    Id.

[111]    Id.; *see also* id. at 45.

[112]    Id. at 45.

[113]    Id.

[114]    Id.

[115]    Id. at 47.

That the identification maybe — well it was obvious to her like it was obvious to everybody Ms. Harvey wasn't going to be any help now on the identification. And she thought that maybe the identification testimony at that trial would not be as strong, not as positive for Mr. Smothers as the first one because of the time of day it happened, midnight, residential neighborhood, not a ton of street lights and that sort of thing. I remember I drove by, as I do all my trials, I drove by the scene.

Plus I think it probably could have been a little worked up a little bit better by the police department, actually, the second one. But I believe that Ms. Parks — and I talked with her this morning to refresh — make sure my memory is correct. She just didn't think her identification proof was as strong and it was her decision to nol-pros it.[116]

Both Smothers and Harvey were witnesses to the attempted murder and aggravated assaults that were charged in Case Number 05-06224.[117] Harvey's identification of Stroud was not as strong in Case Number 05-06224 as it was in the Case Number 05-06225, the aggravated assaults that were tried. Counsel testified: "I don't think it was. And by the time she talked to my investigator, [Harvey] was convinced that it probably was not him but that he had directed it, that he had ordered it."[118] Counsel had no idea whether the State could prove that Stroud ordered the attempted murder. He testified, "I doubt it. I think it would have been a conspiracy to attempt

---

[116]   Id. at 48-49.

[117]   Id. at 49.

[118]   Id.

43

first degree murder if that was the case instead of attempted murder."[119]

Counsel described Smothers' identification of Stroud in Case Number 05-06225 as "rock solid."[120] Counsel was asked whether Smothers' identification was as strong in Case Number 05-06224 as in Case Number 05-06225, and he stated,

> I thought it was but apparently Ms. Parks didn't think it was quite as solid or she wouldn't have nol-prossed it. That's pure speculation on my part, but I thought it was — I thought the testimony at that was going to be much the same as the testimony of the one that actually did go to trial. I thought it was going to be identical, as a matter of fact, just different days and instead of shooting at a car, it was shooting outside their home.[121]

Counsel told Stroud why he decided not to bring up the indictment that had been dismissed.[122] Counsel also told Stroud that the dismissal of Case Number 05-06224 did not mean that the prosecutor believed that Smothers was lying:

> I told him that if Ms. Parks though he was lying about both of them she would have nol-prossed both of them. She just didn't think the identification proof was quite as strong on the second one so she just nol-prossed. Now I told him I had no control over which one she nol-prossed. I said I'd be delighted if she nol-prossed both but she isn't going to do it.[123]

---

[119]    Id.

[120]    Id. at 50.

[121]    Id.

[122]    Id. at 51.

[123]    Id. at 51-52.

44

Counsel did not think there was any weakness in Case Number 05-06224 that could have been used to Stroud's advantage in Case Number 05-06225. He testified, "I can't think of any because Mr. Smothers was adamant he was the one — his identification of Mr. Stroud on both incidents was the one constant throughout the whole thing."[124]

Under questioning by the post-conviction court, counsel testified that he got the police reports as part of the discovery.[125] He also had the statements of Smothers and Harvey.[126] The defense investigator obtained the statements of the victims and other potential witnesses.[127] This material was provided to Stroud.[128]

The Tennessee Court of Criminal Appeals concluded that Stroud did not establish either deficient performance by his attorney or prejudice. Stroud v. State, 2010 WL 376611, at *4. Stroud has not satisfied his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals on this issue was an unreasonable application of Strickland or was based on an unreasonable factual determination. Defense counsel reviewed the prior statements of Smothers and Harvey, as well as the police

---

[124]     Id. at 52.

[125]     Id.

[126]     Id.

[127]     Id. at 53.

[128]     Id.

reports and the reports prepared by his investigators. He also discussed his strategy with other attorneys at the public defender's office. On the basis of that information, defense counsel made the strategic decision that the potential benefit to Stroud of questioning Smothers and Harvey about the attempted murder charged in Case Number 05-06224 were outweighed by the risk of prejudice. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

The first issue is without merit and is DISMISSED.

**C.   Whether the trial court abused its discretion by severing part of a consolidated indictment (Claim 3)**

In his third issue, Stroud asserts that the trial court abused its discretion and committed plain error by allowing one-half of a consolidated indictment to stand trial and by improperly severing the other half of the indictment. (ECF No. 1-1 at 7, 18-22.) Stroud appears to assume that Case Number 05-06224, which charged him with attempted murder and two counts of aggravated assault, was improperly severed by the trial court. As previously discussed, the State made the decision not to try that indictment, which was resolved by *nolle prosequi. See supra* pp. 2 n.2, 32 (quoting ECF No. 1-1 at 31-32).

Respondent argues that this issue is not cognizable in a § 2254 petition because it arises under state law. (ECF No. 12 at 16.) State-law claims cannot be addressed in federal habeas

46

petitions. *See* 28 U.S.C. § 2254(a). Error in the application of state law is not cognizable in a federal habeas proceeding. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480, 116 L. Ed. 2d 385 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); <u>Pulley v. Harris</u>, 465 U.S. 37, 41, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

In his legal memorandum, Petitioner presents this issue as a violation of the Tennessee Rules of Criminal Procedure and Tennessee criminal law. (*See* ECF No. 1-1 at 18-22.) This aspect of the Petition does not, on its face, allege a violation of the United States Constitution. Therefore, relief under 28 U.S.C. § 2254 is not available to Stroud.

Respondent also argues that this issue is barred by procedural default because Stroud did not properly exhaust his claim in state court. (ECF No. 12 at 16-17.) The issue was raised in Stroud's initial *pro se* post-conviction petition,[129] but it was not addressed at the post-conviction hearing or in Stroud's brief to the Tennessee Court of Criminal Appeals on the post-conviction appeal.[130] Stroud's Reply does not address exhaustion or procedural

---

[129]     *See* Pet. for Relief from Sentence or Conviction at 3-4, <u>Stroud v. State</u>, No. 05-06225 (Shelby Cnty. Crim. Ct.), ECF No. 13-11 at PageID 345-46.

[130]     *See* Br. of Appellant, <u>Stroud v. State</u>, C.C.A. No. W2009-01641-CCA-R3-PC (Tenn. Crim. App.), ECF No. 24-1.

default. (*See* ECF No. 22 at 8-10.) Because Stroud failed to provide the Tennessee courts with a full and fair opportunity to consider this issue, and because no further opportunity remains to do so, Claim 3 is barred by procedural default.

Claim 3 is without merit and is DISMISSED.

### D.    The Allegedly Excessive Sentence (Claim 4)

In his fourth issue, Stroud argues that the trial judge imposed an excessive sentence. (ECF No. 1-1 at 22-24.) Stroud raised a challenge to his sentence on direct appeal,[131] and the Tennessee Court of Criminal Appeals rejected it on the merits, stating as follows:

> The defendant argues that he received excessive sentences of seven years and six months for each of his convictions and that the trial court erroneously imposed consecutive sentencing, yielding an effective fifteen-year sentence. The trial court determined that the defendant was a Range II offender.

> When a defendant appeals the length or manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d).[132] However, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court

---

[131]    *See* Br. of Appellant at 13-15, State v. Stroud, No. W2006-01945-CCA-R3-CD (Tenn. Crim. App.), ECF No. 13-7 at PageID 289-91.

[132]    The Tennessee Court of Criminal Appeals stated in a footnote that "[w]e note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal. The defendant was sentenced after the change in the sentencing laws took effect, but the record does not reflect that the defendant signed a waiver of his ex post facto protections to be sentenced under the amended provisions. *See* T.C.A. § 40-35-210, Compiler's Notes." State v. Stroud, 2007 WL 3171158 at *6 n.1.

considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. T.C.A. § 40-35-401(d), Sent'g Comm'n Cmts. This means if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103,-210; see Ashby, 823 S.W.2d at 168.

As a Range II offender, the defendant faced a sentence of six to ten years for each of his Class C felonies. T.C.A. § 40-35-112(b)(3). The trial court found on the basis of certified copies of judgments of the defendant's prior convictions that the defendant had sufficient prior convictions to qualify him as a Range II offender, and it noted as well from the presentence report that he had an additional, extensive history of criminal behavior, which the court found should enhance the defendant's sentences. See T.C.A. § 40-35-114(2) (2003) (providing for enhancement of sentence based upon finding of "previous criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"). The court stated that the defendant was "oblivious" to the law and "just does what he wants, drives when he wants, drugs when he wants, assault[s] people when he wants." The defendant does not contest the findings relative to his criminal history on appeal. Rather, he argues that the trial court erred in declining to apply mitigating weight to the fact that he committed the shooting under strong provocation by the victim from the previous altercation in which the defendant was stabbed. See T.C.A. § 40-35-113(2). However, the defendant's argument fails to account for the fact that

49

the shooting was two days after the stabbing, that the stabbing occurred when the defendant attacked the victim in the victim's home, that the victim was fleeing when the defendant fired shots at him, and that his actions were more fairly characterized as retaliation, rather than action under strong provocation. The trial court did not err in declining to apply mitigating weight for this factor.

The trial court found on the basis of the prior criminal history enhancement factor that the appropriate sentence for the individual convictions was ten years each. However, the court later reduced the sentences to seven years and six months each based upon its finding that consecutive sentences were warranted but that an effective twenty-year sentence did not reasonably relate to the severity of the offense. Upon de novo review, we hold that the defendant has not demonstrated that these determinations were improper.

Further, we note that the trial court acknowledged that it was required to consider probation because the defendant's individual sentences were eight years or less. *See* T.C.A. § 40-35-303(a) (2003) (amended 2005). The court found that the defendant's criminal history and character reflected extremely poorly on his prospects for rehabilitation and denied probation. The record supports this determination.

The defendant also claims that the trial court erred in imposing consecutive sentences. Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that the defendant is an "offender whose record of criminal activity is extensive" or a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(2), (4). For dangerous offenders, "consecutive sentences cannot be imposed unless the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995); *see* State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). Rule 32(c)(1) of the Tennessee Rules of Criminal Procedure requires that the

trial court "specifically recite the reasons" behind its imposition of a consecutive sentence. *See* <u>State v. Donnie Thompson</u>, No. M2002-01499-CCA-R3-CD, Maury County, slip op. at 5 (Tenn. Crim. App. Mar. 3, 2003) (reversing the trial court's imposition of consecutive sentencing because it failed to make a finding under Tennessee Code Annotated section 40-35-115(b) and the record did not support a conclusion that the defendant met the consecutive sentencing prerequisites).

The court found that the defendant was an offender with an extensive record of criminal activity and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation to commit a crime when the risk to human life was high. *See* T.C.A. § 40-35-115(b)(2), (4). With respect to the latter finding, the court noted that the defendant opened fire on the streets of a populous city. The court also found that the circumstances of the offense were aggravated and that extended confinement was "necessary to protect society from [the defendant's] unwillingness to lead a productive life and his resort to criminal activity in furtherance of an antisocietal lifestyle." The court found, however, that given that no one was injured in the crimes, a twenty-year effective sentence did not reasonably relate to [the] severity of the offense. Thus, the court reduced the ten-year sentences to seven years and six months each and imposed them consecutively, for an effective fifteen-year sentence. These findings are supported by the record, and we may not disturb the trial court's sentencing. The defendant has failed to demonstrate error.

<u>State v. Stroud</u>, 2007 WL 3171158 at *6-7.

Respondent contends that this issue is not cognizable in a § 2254 petition because it arises under Tennessee law. (ECF No. 12 at 17.) That argument is well taken. The Petition presents Claim 4 as arising solely under state law.[133]

---

[133]   In his Reply, Stroud characterizes Claim 4 as arising under the Eighth Amendment. (*See* ECF No. 22 at 11.) Stroud did not seek leave to amend his Petition. Even if he were to seek leave to amend, Stroud did not exhaust a constitutional claim.

Respondent also argues that Stroud did not exhaust a federal constitutional claim. (ECF No. 12 at 17-18.) That argument is also well taken. Stroud's brief to the Tennessee Court of Criminal Appeals presented the issue as arising under state law.[134] Because no further avenue exists to exhaust a constitutional challenge to Petitioner's sentence, any constitutional challenge is barred by procedural default.

The fourth issue is without merit and is DISMISSED.

Because every claim asserted by Petitioner is without merit, the Court DENIES the petition pursuant to 28 U.S.C. § 2254. The petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

## V.        APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. Miller-El v. Cockrell, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, § 2254 Rules. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

---

[134]    See Br. of Appellant at 13-15, State v. Stroud, No. W2006-01945-CCA-R3-CD (Tenn. Crim. App.), ECF No. 13-7 at PageID 289-91.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336, 123 S. Ct. at 1039; see also Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. Miller-El, 537 U.S. at 337, 123 S. Ct. at 1039; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. Bradley, 156 F. App'x at 773.

In this case, there can be no question that Petitioner's claims are meritless for the reasons previously stated. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to

appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal *in forma pauperis* is DENIED.[135]

IT IS SO ORDERED this 27th day of September, 2013.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[135]    If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).